Receipt number AUSFCC-9784899

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **JIMMY DEAN RHODEN**, <br><br> Plaintiff, <br><br> v. <br><br> **THE UNITED STATES OF AMERICA** <br><br> Defendant. | Case No. __24-1281 C_____ |

# COMPLAINT

Plaintiff, Chief Warrant Officer Four (Retired) Jimmy Dean Rhoden ("Plaintiff" or "CW4 (Ret.) Rhoden"), brings this action against Defendant, the United States of America ("Defendant"), and alleges the following:

## INTRODUCTION

1. This is an action for denial of pay due Plaintiff under 5 U.S.C. § 5538 (the "Reservist Differential Pay statute"), under which members of the reserve components who are also federal Government employees are entitled to the difference between their civilian and military pay when mobilized to active duty.

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. §1491(a)(1).

3. The statutory basis for invoking jurisdiction is the Reservist Differential Pay statute, 5 U.S.C. § 5538. The Reservist Differential Pay statute provides that employing agencies must pay differential payments to eligible federal civilian employees when they have experienced a pay differential due to active military service in certain circumstances.

1

4. The Reservist Differential Pay statute is money-mandating. *Downey v. United States*, 147 Fed. Cl. 171 (2020).

5. This complaint alleges money damages in excess of $10,000, discussed further below in Paragraphs 9-61.

6. In accordance with 28 U.S.C. § 2501, this action is brought within six years from the date Defendant wrongfully denied Plaintiff his due pay differential.

## PARTIES

7. Plaintiff, CW4 (Ret.) Rhoden, is a citizen of the United States who resides in Boeblingen, Germany.

8. Defendant is the United States of America, acting by and through the Defense Intelligence Agency (DIA), a United States government agency.

## FACTUAL ALLEGATIONS

9. CW4 (Ret.) Rhoden was, at the time of the occurrences giving rise to this Complaint, a civilian employee of the Defense Intelligence Agency (DIA). CW4 (Ret.) Rhoden retired from civilian service with DIA on or about September 30, 2023.

10. During calendar years 2018-2019, CW4 (Ret.) Rhoden held a civilian pay grade of GG-13, Step 8. In calendar years 2021-2022, CW4 (Ret.) Rhoden held a civilian pay grade of GG-13, Step 9.

11. CW4 (Ret.) Rhoden also served in the West Virginia Army National Guard and retired at the rank of Chief Warrant Officer Four (W-4) on or about 28 May 2024.

12. At the time of the occurrences giving rise to this Complaint, CW4 (Ret.) Rhoden was mobilized to Special Operations Command Europe (SOCEUR) in Stuttgart, Germany, where he was paid as a W-3 or W-4 with between twenty-eight and thirty-three years of service.[1]

13. On or about September 28, 2018, Plaintiff received orders to mobilize to active duty for the purpose of "contingency operation for active duty operational support (CO-ADOS) in support of EDI [European Defense Initiative]" for 365 days commencing October 8, 2018. These orders cited 10 U.S.C. § 12301(d) as the statutory authority for the mobilization. Exhibit A is a true and correct copy of Plaintiff's September 28, 2018 mobilization orders.

14. From the start of his mobilization (October 8, 2018) through the end of his mobilization (October 7, 2019), CW4 (Ret.) Rhoden served as the SOCEUR Joint Operations Group – Europe (JOG-E) Human Intelligence (HUMINT) Operations Advisor and Baltics Desk Officer.

15. At no point during his 2018-2019 mobilization did CW4 (Ret.) Rhoden receive differential pay under the Reservist Differential Pay statute.

16. On or about June 8, 2021, Plaintiff received orders to mobilize to active duty for the purpose of "contingency operation for active duty operational support (CO-ADOS) in support of EDI" for an additional 365 days commencing June 14, 2021. These orders cited 10 U.S.C. § 12301(d) as the statutory authority for the mobilization. Exhibit B is a true and correct copy of Plaintiff's June 8, 2021 mobilization orders.

17. From the start of this subsequent mobilization (June 14, 2021) through the end of this subsequent mobilization (June 13, 2022), CW4 (Ret.) Rhoden served as the SOCEUR HUMINT Cell (HOC) Chief.

---

[1] CW4 (Ret.) Rhoden was promoted from Chief Warrant Officer Three (W-3) to Chief Warrant Officer Four in January 2022.

18. At no point during his 2021-2022 mobilization did CW4 (Ret.) Rhoden receive differential pay under the Reservist Differential Pay statute.

19. In relevant part, 5 U.S.C. § 5538(a), the Reservist Differential Pay statute, provides:

> An employee who is absent from a position of employment with the Federal Government in order to perform active duty in the uniformed services pursuant to a call or order to active duty under . . . a provision of law referred to in section 101(a)(13)(B) of title 10 shall be entitled, while serving on active duty, to receive, for each pay period described in subsection (b), an amount equal to the amount by which—
>
> (1) the amount of basic pay which would otherwise have been payable to such employee for such pay period if such employee's civilian employment with the Government had not been interrupted by that service, exceeds (if at all)
>
> (2) the amount of pay and allowances which (as determined under subsection (d))—
>
> (A) is payable to such employee for that service; and
>
> (B) is allocable to such pay period.

20. 10 U.S.C. § 101(a)(13)(B) defines "contingency operation" as

> a military operation that . . . results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12304a, 12305, or 12406 of this title, chapter 13 of this title, section 3713 of title 14, or any other provision of law during a war or during a national emergency declared by the President or Congress.

21. The statutory authority under which CW4 (Ret.) Rhoden was ordered to active duty, 10 U.S.C. § 12301(d), is a provision of law.

22. On September 14, 2001, President George W. Bush issued Presidential Proclamation 7463, declaring a state of national emergency "by reason of the terrorist attacks at the World Trade Center . . . and the continuing and immediate threat of future attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001). This proclamation

has been renewed annually, most recently on September 7, 2023, by President Joseph R. Biden. Continuation of the National Emergency With Respect to Certain Terrorist Attacks, 88 Fed. Reg. 62433 (Sept. 7, 2023).

23. On March 6, 2014, President Barack Obama issued Executive Order 13660, declaring a national emergency to deal with "an unusual and extraordinary threat to the national security and foreign policy of the United States" related to "the actions and policies of persons who have asserted governmental authority in the Crimean region without the authorization of the Government of Ukraine that undermine democratic processes and institutions in Ukraine; threaten its peace, security, stability, sovereignty, and territorial integrity; and contribute to the misappropriation of its assets[.]" Executive Order 13660, 79 Fed. Reg. 13493 (Mar. 6, 2014). The scope of this national emergency has been expanded multiple times. *See* Executive Order 13661, 79 Fed. Reg. 15535 (Mar. 16, 2014); Executive Order 13662, 79 Fed. Reg. 16169 (Mar. 20, 2014); Executive Order 13685, 79 Fed. Reg. 77357 (Dec. 19, 2014); Executive Order 13849, 83 Fed. Reg. 48195 (Sep. 20, 2018); Executive Order 14065, 87 Fed. Reg. 10293 (Feb. 21, 2022). On March 4, 2024, President Joseph R. Biden continued this national emergency for an additional year. Continuation of the National Emergency With Respect to Ukraine, 89 Fed. Reg. 15947 (Mar. 4, 2024).

24. Thus, the United States is, and has at all times since September 11, 2001, including the entire duration of both of CW4 (Ret.) Rhoden's calls to active duty, been under a state of national emergency declared by the President.

25. Despite the ongoing nature of these national emergencies and the extensive use of 10 U.S.C. § 12301(d) to order numerous reservists to active duty for various missions, the Federal Circuit has held that not all reservists mobilized under 10 U.S.C. § 12301(d) since

September 11, 2001 qualify under the Reservist Differential Pay statute. Instead, "to be entitled to differential pay [a Servicemember] must have served pursuant to a call to active duty that meets the statutory definition of contingency operation." *Adams v. Dep't of Homeland Sec.*, 3 F.4th 1375, 1378 (Fed. Cir. 2021), *cert denied,* 142 S.Ct. 2835 (2022) ; *see also Nordby v. Soc. Sec. Admin.*, 67 F.4th 1170, 1173 (Fed. Cir. 2023) ("[T]o receive differential pay, an employee must have been called to active duty that meets the statutory definition of a 'contingency operation.'").[2]

26. Service in a contingency operation includes "activation under the enumerated provisions listed in 10 U.S.C. § 101(a)(13)(B) or activation by 'any other provision of law during a war or during a national emergency declared by the President or Congress.'" *Nordby*, 67 F.4th at 1173. But, "to satisfy as 'any other provision of law' under 10 U.S.C. § 101(a)(13)(B) and qualify as a contingency operation, there must be a connection between the voluntary military service and the declared national emergency." *Id.*

27. Army Regulation (AR) 135-200 "prescribes policies and procedures for ordering Army National Guard (ARNG), Army National Guard of the United States (ARNGUS), and U.S. Army Reserve (USAR) Soldiers" to various forms of active duty. AR 135-200, *Active Duty for Missions, Projects, and Training for Reserve Component Soldier*s, ¶ 1-1 (Oct. 20, 2020), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN30084-AR_135-200-000-WEB-1.pdf (last visited Nov. 15, 2023).

28. Chapter 6 of AR 135-200 pertains to Active Duty for Operational Support (ADOS), which is active-duty service performed "to provide the necessary skilled manpower

---

[2] On June 24, 2024, the United States Supreme Court granted certiorari in *Feliciano v. Department of Transportation* (No. 23-861). The question presented in *Feliciano* is "[w]hether a federal civilian employee called or ordered to active duty under a provision of law during a national emergency is entitled to differential pay even if the duty is not directly connected to the national emergency." Pet. for a Writ of Cert. (Feb. 8, 2024) at I.

assets to support existing or emerging requirements." *Id.* ¶ 6-1(c). ADOS performed in support of an Active Component (AC) unit or command is known as "ADOS-AC." *Id.* ¶ 6-1(c)(2). Because SOCEUR is an Active Component command, the active-duty service to which CW4 (Ret.) Rhoden was ordered was ADOS-AC service.

29. There are three different types of ADOS-AC service. Of these, CW4 (Ret.) Rhoden's orders establish that he was ordered to ADOS-AC service known as "CO-ADOS" – active duty performed by a reservist in support of an overseas contingency mission. *Id.* ¶ 6-1(c)(2)(c).

30. Section IV of Chapter 6 of AR 135-200 governs the issuance of CO-ADOS orders. In particular, AR 135-200 limits the Army's use of CO-ADOS orders to circumstances "when the Secretary of Defense declares that a situation exists as outlined in paragraph 6-19(a), which requires the services of individual ARNGUS, or USAR members in support of contingency operations without the involuntary call-up of [Reserve Component] forces or military operations under the Presidential Reserve Call-up authority." *Id.* ¶ 6-19(b).

31. In turn, paragraph 6-19*a* defines a contingency operation as, *inter alia*, an operation that

> results in the call or order to, or retention on, [active duty] of members of the uniformed services under 10 USC 688, 10 USC 12301(a), 10 USC 12302, 10 USC 12304, 10 USC 12305, 10 USC 12406, AR 135-210, or any other provision of law during a war or during a national emergency declared by the President or Congress.

*Id.* ¶ 6-19(a). This is substantially identical to the definition of "contingency operation" in 10 U.S.C. § 101(a)(13)(B), as invoked in the Reservist Differential Pay statute.

32. Read together, paragraphs 6-19*a* and 6-19*b* of AR 135-200 prescribe the use of CO-ADOS orders only when the resulting active-duty service meets the definition of a contingency operation. *See also id.* ¶ 6-20(a) ("Only CO-ADOS may be used to order [Reserve

7

Component] Soldiers to [Active Duty] for a crisis or contingency mission of the [Regular Army], [Office of the Secretary of Defense], Office of the Joint Chiefs of Staff, or Joint Command when the mission requires specialized experience or knowledge which the [Reserve Component] Soldier possesses and which is unavailable in the [Regular Army].").

33. Except when mobilizing a member of the Retired Reserve, the only statutory authority that the Army is permitted to cite when issuing CO-ADOS orders is 10 U.S.C. § 12301(d). *Id.* ¶ 6-25(a).

34. Because 10 U.S.C. § 12301(d) is not enumerated in the AR 135-200 definition of "contingency operation," however, the Army can only issue CO-ADOS orders pursuant to 10 U.S.C. § 12301(d) if it qualifies as "any other provision of law during a war or during a national emergency declared by the President or Congress." As the Federal Circuit made clear in *Nordby*, for 10 U.S.C. § 12301(d) to qualify as "any other provision of law," the active duty service and the national emergency must be connected. *Nordby*, 67 F.4th at 1173.

35. CW4 (Ret.) Rhoden's mobilization orders (Exhibits A-B) are CO-ADOS orders. It follows that the active-duty service CW4 (Ret.) Rhoden was being ordered to perform *must* satisfy the definition of "contingency operation." Moreover, because CW4 (Ret.) Rhoden's mobilization orders cite 10 U.S.C. § 12301(d) as the statutory authority for his mobilization, in accordance with AR 135-200, the active-duty service CW4 (Ret.) Rhoden was being ordered to perform *must* satisfy the definition of "contingency operation" via a connection between the service and the declared national emergency.

36. CW4 (Ret.) Rhoden's service therefore qualifies for differential pay under 5 U.S.C. § 5538 for the periods October 8, 2018 through October 7, 2019 and June 14, 2021 through June 13, 2022.

37. Beyond the fact that CW4 (Ret.) Rhoden's mobilization orders expressly state that his active-duty service was part of a contingency operation, and that the very issuance of his mobilization orders necessarily requires the Army to have made the requisite determinations to support the issuance of his CO-ADOS orders, the operation to which CW4 (Ret.) Rhoden mobilized (EDI) bears indicia of a contingency operation.

38. For example, through FY 2021, EDI was funded entirely through Overseas Contingency Operations (OCO) appropriations. *See* Gov't Accountability Office, GAO-23-105619, *European Deterrence Initiative: DOD Should Establish Performance Goals and Measures to Improve Oversight* (2023), https://www.gao.gov/assets/gao-23-105619.pdf.

39. Similarly, in its OCO budget request for FY 2019, the Air Force noted that the reauthorization of Presidential Proclamation 7463 provided it with "the authority to order to active duty Ready Reserve Members" and requested additional military personnel appropriations "to finance the incremental costs . . . for personnel mobilized for duty . . . in support of OFS, OIR ***and EDI***" accordingly. Dep't of the Air Force, *Fiscal Year (FY) 2019 Budget Estimates, Overseas Contingency Operations (OCO) Request, Military Personnel Appropriation* 1, 4 (2018), https://www.saffm.hq.af.mil/Portals/84/documents/FY19/MILPERS/Air%20Force%20Military%20Personnel%20OCO%20FY19.pdf?ver=2018-02-12-182920-317 (emphasis added).

40. Moreover, EDI encompasses operations relevant to the national emergencies declared in Presidential Proclamation 7463 and Executive Order 13660. For instance, EDI (formerly designated Operation Atlantic Resolve – European Reassurance Initiative) includes "increased partnership activities with NATO and other partner nations [and] build and strengthen regional partner capacity to responsibly manage and conduct counter terrorism and stability

operations. This initiative will also enhance the NATO and partner nation counter terrorism training and interoperability with U.S. forces." Dep't of Def., *Department of Defense Budget Fiscal Year 2015, Counterterrorism Partnerships Fund and the European Reassurance Initiative* 22 (2014), https://comptroller.defense.gov/Portals/45/Documents/defbudget/fy2015/amendment/FY2015_OCO_CTPF_and_%20ERI.pdf.

41. SOCEUR's mission is to "employ[] special operations forces across the USEUCOM [United States European Command] area of responsibility to enable deterrence, strengthen European security collective capabilities and interoperability, and counter transnational threats to protect U.S. personnel and interests." U.S. Special Operations Command, *United States Special Operations Command, Fact Book – 2019* 37, https://www.socom.mil/FactBook/2019%20Fact%20Book.pdf (last visited Nov. 12, 2023). One of SOCEUR's "key focus area[s] is combatting terrorism in USEUCOM's southern flank." *Id.* The counter-terrorism aspects of SOCEUR's mission are accomplished through multiple lines of effort, including soft power diplomacy, capacity building, and support of active counter-terrorism operations. In his capacities as SOCEUR JOG-E HUMINT Operations Advisor, Baltics Desk Officer, and HOC Chief, CW4 (Ret.) Rhoden was involved across these lines of effort.

42. For instance, in his roles as the SOCEUR JOG-E HUMINT Operations Advisor and Baltics Desk Officer during his first (2018-2019) mobilization, CW4 (Ret.) Rhoden established and managed HUMINT Operations within the Baltic countries of Latvia, Lithuania, and Estonia.

43. Similarly, in his role as the SOCEUR HOC Chief during his second (20211-2022) mobilization, CW4 (Ret.) Rhoden tasked, trained, and mentored US military service members in the collection of HUMINT throughout Europe for SOCEUR.

44. These are additional reasons that CW4 (Ret.) Rhoden's active-duty service qualified him for differential pay under 5 U.S.C. § 5538(a) for the periods October 8, 2018 through October 7, 2019 and June 14, 2021 through June 13, 2022.

## COMPUTATION OF DIFFERENTIAL PAY OWED

45. The Reservist Differential Pay statute further provides that

> amounts under this section shall be payable with respect to each pay period (which would otherwise apply if the employee's civilian employment had not been interrupted) during which such employee is entitled to re-employment rights under chapter 43 of title 38 with respect to the position from which such employee is absent (as referred to in subsection (a)); and for which such employee does not otherwise receive basic pay (including by taking any annual, military, or other paid leave) to which such employee is entitled by virtue of such employee's civilian employment with the Government.

5 U.S.C. § 5538(b).

46. CW4 (Ret.) Rhoden's first mobilization began on or about October 8, 2018 and continued until on or about October 7, 2019. CW4 (Ret.) Rhoden's second mobilization began on or about June 14, 2021 and continued until on or about June 13, 2021. During these time periods, CW4 (Ret.) Rhoden was entitled to re-employment rights with respect to his position within the DIA under chapter 43 of Title 38, United States Code.

47. During his first (2018-2019) mobilization, CW4 (Ret.) Rhoden was paid as a W-3 with between twenty-eight and thirty years of service, rather than as a GG-13, Step 8 civilian employee.

48. During his second (2021-2022) mobilization, CW4 (Ret.) Rhoden was paid as a W-3 with thirty-two years of service through December 2021 and as a W-4 with either thirty-two or thirty-three years of service beginning in January 2022, rather than as a GG-13, Step 9 civilian employee.

49. The Office of Personnel Management (OPM) publishes Policy Guidance Regarding Reservist Differential under 5 U.S.C. § 5538 at https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/reservist-differential/policyguidance.pdf (hereinafter the "OPM Policy Guidance"). The OPM Policy Guidance explains in detail how to compute reservist differential.

50. First, the OPM Policy Guidance requires "projecting the gross amount of civilian 'basic pay' that would otherwise have been payable to an employee for each pay period within a qualifying period if the employee's civilian employment had not been interrupted by military active duty." OPM Policy Guidance at 6. Exhibit C sets forth CW4 (Ret.) Rhoden's projected civilian basic pay, by pay period, during his mobilization, computed in accordance with the OPM Policy Guidance.

51. Next, the OPM Policy Guidance "requires determining the actual paid gross amount of military pay and allowances allocable to each pay period in a qualifying period." OPM Policy Guidance at 9. This is a multi-step process that includes (1) identifying the affected months; (2) determining the monthly amount of military pay and allowances; (3) computing the military daily rate of pay; and (4) allocating military pay and allowances to the civilian biweekly pay period. *Id.* at 9-10. Exhibit D sets forth CW4 (Ret.) Rhoden's military daily rate of pay, computed in accordance with steps (1) through (3) of the OPM Policy Guidance. Exhibit E

allocates CW4 (Ret.) Rhoden's military pay and allowances to the civilian biweekly pay period in accordance with the step (4) of the OPM Policy Guidance.

52. Once the projected civilian basic pay is computed and military pay and allowances are allocated to the civilian biweekly pay periods, the OPM Policy Guidance directs a comparison between the two amounts "[f]or each civilian biweekly pay period[.]" OPM Policy Guidance at 10. "If the allocated military pay and allowances are greater than or equal to the project civilian basic pay for any biweekly pay period, no reservist differential is payable for that pay period. If the projected civilian basic pay is greater than the allocated military pay and allowances for any biweekly pay period, the difference represents the *unadjusted* reservist differential." *Id.* (emphasis in original). Exhibit F sets forth CW4 (Ret.) Rhoden's unadjusted reservist differential, by pay period, during his mobilization, computed in accordance with the OPM Policy Guidance.

53. Finally, the OPM Policy Guidance directs that the unadjusted reservist differential be adjusted for paid hours (*e.g.*, civilian paid work hours or paid time off, such as paid military leave). OPM Policy Guidance at 10-11. This is done by computing the percentage of total hours in the civilian biweekly pay period that were leave without pay (LWOP) and multiplying that percentage by the unadjusted reservist differential. The result is the amount of reservist differential owed for that civilian biweekly pay period. *Id.* at 11. Exhibit G sets forth CW4 (Ret.) Rhoden's adjusted reservist differential, by pay period, during his mobilization, computed in accordance with the OPM Policy Guidance.

54. As shown in Exhibit G, over the course of his mobilization, the total differential between CW4 (Ret.) Rhoden's military pay and his civilian pay, computed on a per-pay period basis in accordance with the OPM Policy Guidance, was approximately $11,219.86.

55. Therefore, CW4 (Ret.) Rhoden has lost approximately $11,219.86, plus interest from the date each differential payment should have been made, as a result of Defendant's wrongful failure to pay him the differential pay to which he is entitled under 5 U.S.C. § 5538.

## COUNT

56. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 55 of this Complaint.

57. Plaintiff was absent from his federal civilian employment with the DIA to perform active-duty military service under contingency operation for active duty operational support (CO-ADOS) mobilization orders issued pursuant to 10 U.S.C. § 12301(d) during a time of national emergency declared by the President under Presidential Proclamation 7463 and Executive Order 13660. On their face, and in accordance with AR 135-200, CW4 (Ret.) Rhoden's orders establish that he was ordered to active duty for a contingency operation and that his service was connected to a national emergency. Moreover, his specific duties and responsibilities while mobilized are connected to the same national emergency. CW4 (Ret.) Rhoden's orders therefore fall within the scope of 5 U.S.C. § 5538(a).

58. Throughout his entire mobilizations, Plaintiff was entitled to re-employment rights with respect to his position within the DIA under chapter 43 of Title 38, United States Code.

59. Plaintiff did not receive the civilian pay to which he was otherwise entitled by virtue of his employment within the DIA during his mobilizations.

60. Plaintiff was therefore entitled to differential pay under 5 U.S.C. § 5538 during his mobilizations.

61. Defendant has violated 5 U.S.C. § 5538 by failing to pay Plaintiff the differential pay to which he is entitled.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff demands judgment as follows:

(a) Payment of all wrongfully denied differential pay due to him under the law, totaling $11,219.86;

(b) Interest on such wrongfully denied differential pay, accruing as of the dates on which such payments were to be made;

(c) Award to Plaintiff of costs and attorneys' fees; and

(d) The grant of such other relief as the Court deems just and proper.


Dated: August 20, 2024                                  Respectfully submitted,

/s/ Scott A. Felder
Scott A. Felder
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
sfelder@wiley.law
Phone: (202) 719-7000
Facsimile: (202) 719-7049

*Counsel for Chief Warrant Officer Four (Retired) Jimmy Dean Rhoden*